UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-14250-CV-MOORE
MAGISTRATE JUDGE REID

JONATHAN R. RODRIGUEZ,

      Petitioner,

v.

MARK INCH,
SEC'Y, FLORIDA DEP'T OF CORR.,

      Respondent.

_____/

## REPORT OF MAGISTRATE JUDGE RE
## FEDERAL HABEAS CORPUS PETITION - 28 U.S.C. § 2254

### I. Introduction

Petitioner, **Jonathan R. Rodriguez,** has filed a *pro se* Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his conviction and sentence for first degree murder, kidnapping, and tampering with physical evidence, following a jury trial in the Circuit Court of the Tenth Judicial Circuit in and for Highlands County, **Case No. 28-2012-CF-000646**. [ECF No. 12]. This case has been referred to the Undersigned for consideration and report, pursuant to 28 U.S.C. § 636(b)(1)(B)-(C) and S.D. Fla. Admin. Order 2019-02. [ECF No. 2].

The Undersigned has reviewed the Amended Petition [ECF No. 12], and supporting Memorandum [ECF No. 12-1], the State's Response [ECF No. 17] and Petitioner's Reply [ECF

1

No. 22]. Upon review, the Amended Petition [ECF No. 12] should be **DENIED**, as further discussed below.

## II. Claims

Construing the arguments liberally pursuant to *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (per curiam), Petitioner raises five grounds for relief, the first raised on direct appeal, and the remainder raised in his Fla. R. Crim. P. 3.850 motion for post-conviction relief ("Rule 3.850 Motion"), as follows:

1. The trial court violated his confrontation rights under *Crawford*[1] when it permitted the medical examiner to provide hearsay testimony regarding the kidnapping and subsequent death of the victim, predicated on findings contained in the Wuesthoff Reference Laboratories ("Wuesthoff Laboratories") report ("Wuesthoff Report"). [ECF No. 12 at 6; ECF No. 12-1 at 4].

2. His attorney was ineffective for failing to file a motion to compel the deposition or trial testimony of Susan Adams, a toxicologist, who signed the Wuesthoff Report. [ECF No. 12 at 8; ECF No. 12-1 at 5].

3. His attorney was ineffective for failing to investigate Wuesthoff Laboratories and its report regarding its preparation and the findings contained therein. [ECF No. 12 at 9; ECF No. 12-1 at 5].

4. His attorney was ineffective for failing to object to the testimony of Dr. Bruce Goldberger ("Dr. Goldberger"), the state's rebuttal expert witness. [ECF No. 12 at 11; ECF No. 12-1 at 7].

5. His attorney was ineffective for failing to object to various instances of prosecutorial misconduct during closing argument. [ECF No. 12 at 17; ECF No. 12-1 at 8].

---

[1] *Crawford v. Washington*, 541 U.S. 36, 61 (2004).

### III. Procedural Background[2]

Petitioner and his co-defendant, Kenneth Edward Felipe, Jr. ("Felipe") were initially charged by Information with second degree murder, abuse of a dead human body, and tampering with physical evidence. Later, Petitioner was charged by Amended Indictment with the first degree murder of Aaron Andrew Doty (the "victim" or "Aaron Doty"), in violation of Fla. Stat. § 782.04 (Count 1), kidnapping of Aaron Doty, in violation of Fla. Stat. § 787.01 (Count 2), and tampering with physical evidence by destroying, concealing, or removing a record, document, or thing, to-wit, the body of Aaron Doty and/or evidence located on the body, and/or blood located at the scene of the beating, in violation of Fla. Stat. § 918.13 (Count 3). [ECF No. 18-1, Ex.2 at 6-8]. On January 14, 2015, the court granted a change of venue from Highlands County to Polk County, Florida. [ECF No. 18-1, Ex. 4 at 12]. Following a joint trial, Petitioner and Felipe were both found guilty of all charges. [ECF No. 18-1, Ex. 6 at 17]. Petitioner was sentenced to a total term of life imprisonment without the possibility of parole as to Count 1 and Count 2, to run consecutively, and a term of five years of imprisonment as to Count 3, to run consecutive to Count 2. [ECF No. 18-1, Ex. 7 at 19-27].

Petitioner appealed, raising multiple grounds of trial court error, including **claim 1** of this federal Petition. [ECF No. 18-1, Ex. 8 at 36]. On **May 27, 2016,** the Second District Court of Appeal *per curiam* affirmed the convictions and sentences, in a decision without written opinion. *See Rodriguez v. State*, 197 So. 3d 50 (Fla. 2d DCA 2016), [ECF No. 18-1, Ex. 11 at 270].

---

[2] Only the proceedings relevant to the issues raised here are summarized below.

On **July 12, 2017,** Petitioner filed his first Rule 3.850 Motion in state court raising multiple claims, including **claims 2 through 5**, as listed above. [ECF No. 18-2, Ex. 13 at 2-36]. The trial court denied relief on the merits, and that denial was subsequently *per curiam* affirmed on appeal in a decision without written opinion. *Rodriguez v. State*, 275 So. 3d 603 (Fla. 2d DCA 2019), [ECF No. 18-3, Ex. 17 at 243]. The appeal concluded with the issuance of the mandate on **August 20, 2019.** [ECF No. 18-3, Ex. 19 at 245].

Before the state Rule 3.850 proceedings concluded, Movant filed his initial Petition in the United States District Court for the Northern District of Florida, on **July 16, 2019**. [ECF No. 1 at 42]. That court transferred the Petition here, and this Court ordered Petitioner to amend his Petition. [ECF Nos. 4, 8]. Petitioner timely filed his Amended Petition on **August 22, 2019**. [ECF No. 12 at 16].

### IV. Threshold Issues - Timeliness and Exhaustion

Respondent concedes that this case is timely. [ECF No. 12 at 10-11]. Because Respondent has explicitly waived any statute of limitations defense, this Court need not determine whether the waiver is accurate. *See* 28 U.S.C. §2244(d)(1)-(2); *see also Wood v. Milyard*, 566 U.S. 463, 473 (2012) (citing *Day v. McDonough*, 547 U.S. 198, 210-11 (2006)). Respondent has also waived any exhaustion defense, acknowledging that the claims raised here have been exhausted by Petitioner either on direct appeal or in his Rule 3.850 Motion. [ECF No. 17 at 7].

### V. Governing Legal Principles

#### A. Standard of Review

This Court's review of Petitioner's claims is governed by the Antiterrorism and Effective

Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also Davis v. Jones*, 506 F.3d 1325, 1331 n.9 (11th Cir. 2007). "AEDPA limits the scope of federal habeas review of state court judgments." *Pittman v. Sec'y, Fla. Dep't of Corr.*, 871 F.3d 1231, 1243 (11th Cir. 2017). "The Purpose of the AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the criminal justice systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quotation marks omitted).

Thus, the Court may grant relief from a state court judgment only if the state court's decision on the merits of the issue was (1) contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d). In that respect, the Eleventh Circuit has made clear that:

> [a] state court's decision rises to the level of an unreasonable application of federal law only where the ruling is 'objectively unreasonable, not merely wrong; even clear error will not suffice.' *Virginia v. LeBlanc*, 582 U.S. __, __, 137 S. Ct. 1726, 1728, 198 L.Ed.2d 186 (2017) (per curiam) (quoting *Woods v. Donald*, 575 U.S. __. __. 135 S. Ct. 1372, 1376, 191 L.Ed.2d 464 (2015) (per curiam)). This standard is "meant to be" a difficult one to meet. *Harrington v. Richter*, 562 U.S. 86, 102, 131 S. Ct. 770, 786, 178 L.Ed.2d 624 (2011).

*Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1053 (11th Cir. 2017).

Federal courts "must also presume that 'a determination of a factual issue made by a State court [is] correct,' and the petitioner 'ha[s] the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Morrow v. Warden*, 886 F.3d 1138, 1147 (11th Cir. 2018) (quoting 28 U.S.C. § 2254(e)(1)). "This presumption of correctness applies equally to factual

5

determinations made by the state trial and appellate courts." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012) (quoting *Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003)).

More recently, the Supreme Court in *Wilson v. Sellers*, 138 S. Ct. 1188, 1194 (2018), concluded there is a "look through" presumption in federal habeas corpus law, as silence implies consent. *See also Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016) (per curiam) (adopting the presumption that silence implies consent). Where the state court's adjudication on the merits of a claim is unaccompanied by an explanation, the Supreme Court of the United States instructs that:

> [T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

*Wilson*, 138 S. Ct. at 1192. In other words, if the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* However, if the relevant state-court decision on the merits is not accompanied by a reasoned opinion, because it was summarily affirmed or denied, a federal court "should 'look through' the unexplained decision to the last state-court decision that does provide a relevant rationale." *Id.*

The petitioner has the burden of proof and the §2254(d)(1) standard is a high hurdle to overcome. *See Bobby v. Dixon*, 565 U.S. 23, 24 (2011).

### B. Ineffective Assistance of Counsel Principles

**Claims 2 through 5** challenge counsel's effectiveness. To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) his counsel's performance was

deficient, falling below an objective standard of reasonableness; and (2) he suffered prejudice resulting from that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  The standard is the same for claims challenging counsel's ineffectiveness on appeal. *See Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005) (finding appellate counsel is not ineffective for failing to raise meritless issue on appeal that was not preserved at trial).

Petitioner must provide factual support for his contentions regarding counsel's performance. *See Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the *Strickland* test. *See Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1333-34 (11th Cir. 2012).

To establish deficient performance, Petitioner must show that, in light of all circumstances, counsel's performance was outside the wide range of professional competence. *See Cummings v. Sec'y for the Dep't of Corr.,* 588 F.3d 1331, 1356 (11th Cir. 2009). Regarding the prejudice component, the Supreme Court has explained "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* The Court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of them. *See id.* at 697; *see also Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013).

**VI. Facts Adduced at Trial**

Given the claims raised in the federal habeas proceeding, a detailed recitation of the

evidence adduced at trial is warranted.[3]

## A. State's Evidence

**James Andrew Doty** ("James Doty"), the victim's father, testified that, on Saturday, June 9, 2012, his son went out with a friend, Abhi Shah ("Shah"). [ECF No. 19-20 at T. 2164-65]. Generally, if his son were going to stay out all night and return home, he would text his father, and always, at the end of the text messages, write that he loved them. [*Id.* at T. 2165]. James Doty expected his son home that evening because they had yard work to do on Sunday. [*Id.*]. However, at around 6:00 a.m. Sunday morning, he received a text message from his son stating simply he would not be home. [*Id.* at T. 2166].

Later that day, James Doty became more concerned when his son still had not come home, so he started calling friends to find out who might have information concerning his son's whereabouts. [ECF No. 19-20 at T. 2166.]. After driving around the community where Shah lived, he saw Shah's truck parked in front of a house in the Sebring area. [*Id.*]. Although he tried to see if Shah was home, he was unsuccessful and did not make contact with Shah. [*Id.* at T. 2167].

Through contact with his son's friends, James Doty learned later that day that his son had attended at party on Saturday night at the home of Kenneth Felipe ("Felipe") and Jonathan Rodriguez ("Petitioner"). [*Id.*]. When James Doty drove up to the home, he saw that Shah's truck was parked in the driveway. [*Id.*]. When Shah came out the front door of the home, he saw James Doty and ran towards the side of the house. [*Id.* at T. 2168]. James Doty yelled to Shah wanting to

---

[3] The trial transcripts have been provided by Respondent and are docketed on CM/ECF at ECF No. 19. Citations to the transcripts will reflect the precise appendix, followed by the letter "T" and the page number of the transcript, not that imprinted by CM/ECF.

know the whereabouts of his son and what had happened to him. [*Id.*].

James Doty saw other people at the residence, but only made contact with Petitioner, whom he later identified in court. [*Id.*]. At the time, he asked Petitioner if he had seen his son and when. [*Id.* at T. 2169]. After leaving Petitioner's residence and returning home, James Doty called the sheriff's department and reported his son as missing. [*Id.* at T. 2172]. On Monday morning, James Doty was notified that his son's body had been found. [*Id.*].

**Cody Kennedy ("Cody")** testified as a state witness that he arrived at the party late Saturday night, and then fell asleep there. [ECF No. 19-24 at T. 2770-71]. When he woke up, he saw the victim outside, propped up against the wall, moaning. [*Id.* at T. 2783-86]. At the time, everyone had left, so Cody went back inside and fell asleep again, while Petitioner and his co-defendant went to their rooms. [*Id.*]. When Cody woke up at around 11:30 a.m., he saw the victim still sitting against the house, and thought he was dead because his arms were no longer limp, but stiff out in front of him. [*Id.* at T. 2829, 2831-32]. Cody, Petitioner, and Felipe stared at each other, not saying anything. [*Id.* at T. 2833]. After Petitioner put the victim in Delvin Elliott's ("Elliott") truck, Felipe put his hand on the victim's neck, but could not find a pulse. [ECF No. 19-24 at T. 2791-92].

At around noon, Felipe drove the truck behind a gas station, while Petitioner was in the passenger seat, and Cody in the back. [*Id.* at T. 2794]. Once there, Petitioner got out of the truck, filled up a portable gas tank, and got back into the truck, then they drove to the woods. [*Id.* at T. 2794-96.]. In the woods, Petitioner took the gas tank while Felipe unloaded the victim, dragging him down a trail. [*Id.* at T. 2796-97]. Petitioner asked Cody to ensure no one was following. [*Id.*].

9

Eventually, they stopped once they were out of sight of the road. [*Id.* at T. 2798-99]. Petitioner then poured the gasoline all over the victim. [*Id.* at T. 2799]. When Felipe bent down with a lighter in his hand, Cody turned around and started walking back down the road, but heard the fire starting so he turned around and saw flames everywhere. [*Id.* at T. 2799-2800]. As he turned again to continue walking down the road, the two ran by him so he started running towards the truck. [*Id.* at T. 2800].

When they returned to Petitioner's home, Petitioner asked Cody to "take the blame for it" because he was "underage" and "won't get in trouble." [*Id.*]. Once back at Petitioner's house, they all took off their clothes and put it in a bag. [*Id.* at T. 2801]. Devin Elliott, the truck owner, was awake when they returned to Petitioner's house. [*Id.*]. Petitioner then took a big container of dish soap and dumped it onto the truck bed because it had blood stains. [*Id.*].

Later that day, Felipe took the bag of clothing to Travis Marks' ("Marks") home. [ECF No. 19-22 at T. 2541-50, 2557; ECF No. 19-24 at T. 2802]. That Sunday, Katelyn Young ("Young") and Marks went to Petitioner's home for dinner, at that time Petitioner handed Marks two gas cans which Young eventually turned over to law enforcement. [*Id.* at T. 2659-60]. She later told her father, who worked for the sheriff's office, about the bag of clothing Felipe had left at her house. [*Id.* at T. 2555-62].

When Shah showed up at Petitioner's home, they went with him to Burger King and then to Walmart. [*Id.*]. While at Walmart, Josh Gomez and Brad Doty pulled up next to the truck and asked Cody what had happened to the victim. [*Id.* at T. 2803]. Before Cody could respond, Petitioner and Felipe returned to the truck and responded, telling them they did not know anything.

10

[*Id.* at T. 2803].

When Cody was eventually interviewed by law enforcement, he voluntarily gave consent to search his phone. [*Id.* at T. 2806]. He admits that during the first two interviews, he was not completely truthful, except for the fact that he had taken a video, but denied being present when the victim was burned. [*Id.* at T. 2805-06].

**Danielle Ely** ("Ely") testified that she used to date the victim, but at the time of the incident, they were merely friends and no longer dating, because she could not handle his excessive drinking and fighting. [ECF No. 19-25 at T. 2867-2962]. Ely was at the party when she heard Petitioner getting mad at the victim for not fighting with Richard LeClair ("LeClair"). [*Id.*]. She saw the first punch being thrown but could not see whose arm it was. [*Id.*].

After talking with law enforcement, Ely spoke with Petitioner, who told her he had kicked the victim three times. [*Id.* at T. 2869-92, 2916-21]. She acknowledged testifying during a deposition that she overheard Felipe state a couple of times, "that's enough." [*Id.* at T. 2892-99]. After the victim had been knocked unconscious, she and everyone at the party did not think much about it because it had happened frequently before. [*Id.* at T. 2900-2915].

**Madison Dillon** ("Dillon") testified she arrived at the party on Saturday at 1:00 a.m. [ECF No. 19-21 at T. 2389-93]. She recalled sitting next to LeClair when the victim attempted to provoke a fight with LeClair, but LeClair ignored him, never moving off the couch. [*Id.* at T. T. 2400, T. 2419]. However, she did hear Petitioner ask the victim to leave, but the victim refused, and the next thing she saw was the victim being dragged outside onto the patio with his pants around his ankles. [*Id.* at T. 2402]. Dillon covered the victim's genitalia with his shirt, and tried to revive him,

11

but he just moaned and remained unconscious. [*Id.* at T. 2403]. After she left the party and got home, she called the victim's cousin and his aunt. [*Id.* at T. 2405]. Cody's video of the punch was played for the jury and Dillon was able to identify some of the people and voices in the video. [*Id.* at T. 2414-29]. Dillon did not think much about the victim's state because it was not uncommon for there to be drinking and fighting where people get knocked out. [*Id.* at T. 2429-33]. Further, Dillon testified she did not consider the altercation with the victim a fight because the victim never fought back, and never saw anyone have their pants pulled down or being lit on fire after they were unconscious. [*Id.* at T. 2433-35]. **LeClair** corroborated Dillon's testimony, and denied taking part in any of the "hotboxing" that was occurring at Petitioner's house that night. [*Id.* at T. 2459-69].

On the Thursday after the Saturday party, **Jimmy Disbrow** ("Agent Disbrow"), an FBI Fugitive Task Force Officer, testified that he and others drove to the Orlando area, and were surveilling the home of Felipe's cousin, Giovanni Burgos ("Burgos"). [ECF No. 19-26 at T. 3021-3035]. After Jessica Molano ("Molano"), Burgos's girlfriend left the apartment, Agent Disbrow effected a vehicular traffic stop. [*Id.*]. She admitted that Petitioner and others were in the apartment and provided law enforcement with the apartment key, but it did not work so they kicked the door in and found Petitioner and the others. [*Id.*]. At the time, they were taken into custody and transferred to Highland County, where they did not provide a statement. [*Id.* at T. 3026].

**Chelsea Davis** ("Davis"), the victim's neighbor, her sister, and the victim's brother, helped search for the victim on Monday morning, searching the back area of Sun 'n Lakes, where she discovered the victim's burned body. [ECF No. 19-21 at T. 2372-81]. Davis notified law enforcement of the discovery but did not approach the body or disturb the crime scene. [*Id.*].

12

**Deputy Oliver Stephen Worley** ("Dep. Worley"), with the Highlands County Sheriff's Office, testified he was assigned to the Criminal Investigation Unit, assisted in the investigation of James Doty's missing son, Aaron Doty. [*Id.* at T. 2183-85]. Dep. Worley testified that on Monday, June 11th, they arrived at Cody's home, and obtained verbal and written consent from his mother to speak with Cody, a minor, and search the contents of Cody's cellular phone. [*Id.* at T. 2186]. When they were unable to access information from the phone, they placed the phone into evidence. [*Id.* at T. 2187-]. From Cody's interview, Det. Worley learned there was video footage showing the Saturday altercation between the victim and Petitioner. [*Id.* at T. 2189].

A Federal Bureau of Investigations ("FBI") engineer testified that he received Cody's phone and was able to recover two videos, one from an altercation at a home, and another of a man in the back of a pick-up truck. [*Id.* at T. 2218-42.]. Segments of the first video were written over so the data was corrupted, showing pauses where nothing plays, but the second video footage was intact. [*Id.* at T.2218-29]. Both videos were introduced at trial and played for the jury. [*Id.*].

Next, a crime scene investigator for the Highlands County Sheriff's Office ("Highlands Sheriff"), testified that he was directed to a location where a burned body was located around mid-day on June 11, 2012. [*Id.* at T. 2245-2304]. Fennell helped secure the crime scene and took photographs of the body and the surrounding area. [*Id.* at T. 2245-49]. Based on positioning of the body, Fennel determined that the victim was laying on his back when he was burned, as depicted in the photograph introduced into evidence as there were flesh-covered areas that did not show any burn damage. [*Id.* at T. 2293].

Testimony from additional detectives established that soil samples and samples from

13

clothing underneath the victim were collected to be tested for the presence of gasoline. [ECF No. 19-21 at T. 2316-2328]. It was determined that the area was burned using an accelerant, gasoline, but it could not be ascertained whether the resulting fire was a "flash fire" or whether it "had a lingering burn." [*Id.* at T. 2330-32]. It also could not be determined when the gasoline was applied, how it was applied, or how much was applied. [*Id.* at T. 2359-64, 2368].

**Detective Brett Hinkle** ("Det. Hinkle") with the Highlands County Sheriff's Office retrieved the bag of clothes Felipe had left at the home of Young and Marks. [ECF No. 19-26 at T. 2998-3007]. The sheets and towels inside the bag had the same pattern as the sheets and towels found with the victim's body. [*Id.* at T. 3007-18]. A few days later, he also retrieved the gas cans that Marks had gotten from Petitioner. [*Id.* at T. 3006].

**Dr. Stephen John Nelson** ("Dr. Nelson"), the chief medical examiner for Polk, Hardee, and Highlands County, testified that he is trained in pathology, with a subspecialty in forensic pathology, and explained generally how an autopsy is performed, and then more specifically how he performed the autopsy on the victim. [ECF No. 19-23 at T. 2594-2602]. Dr. Nelson explained that in a fire, a person's arms and hands change, undergoing "pugilistic posturing," meaning they contract and look as though they were throwing punches. [*Id.* at T. 2603]. The elbows, wrists, and knees are slightly flexed because the heat source causes the muscle to contract. [*Id. at* T. 2603]. Contraction of the muscles occurs regardless of whether the victim is alive or dead at the time they are near the heat source. [*Id.*].

Part of the victim's abdominal wall was consumed by the fire, "exposing multiple loops of bowel" and "splitting" of the skin on his left and right arms because of the "intense heat." [*Id.* at

14

T. 2604]. The back side of the victim's body was not burned because it was in contact with the ground. [*Id.* at T. 2606]. Typically, when conducting an autopsy, Dr. Nelson looks for bruising, but with the victim, this was "hampered" because of the "dark black" "coloration of the body." [*Id.* at T. 2610].

Dr. Nelson recalled there was a distinct odor of gasoline emanating from all of the victim's body. [*Id.* at T. 2612]. Dr. Nelson explained that with smoldering fires, or flash-fires where gasoline burns, as was the case with the victim, this does not produce a significant amount of soot in the trachea or airways. [*Id.* at T. 2614-16]. Dr. Nelson also found the lungs were heavy, with the left lung weighing 560 grams and the right 590 grams, well over 250 grams what they should have weighed, suggesting that the lungs were "congested" [*Id.* at 2618]. Dr. Nelson commented that the lungs would not have expanded and gained such weight if the victim had not been breathing and had "just dropped without any other intervention." [*Id.* at T. 2619]. The autopsy also revealed that the victim had a hemorrhage on his tongue, which confirms he was still alive when he bit it. [*Id.* at T. 2622]. The victim's hyoid bone was also broken which is typically as a result of "manual strangulation" or a "choke hold," but is not a fatal injury. [*Id.* at T. 2628].

Dr. Nelson opined that the victim was alive at the time he was set on fire because he had "an 18 percent carboxyhemoglobin level in his blood." [*Id.* at T. 2673-74]. He could not, however, opine whether the level of carboxyhemoglobin in his blood was as a result of a "flash-over-fire" or not, because it was not his area of expertise, and best left to the state fire marshal officers. [*Id.* at 2674]. Given the state of the victim's body, coupled with the significant amount of carboxyhemoglobin, the victim could not have possibly gotten this amount of carboxyhemoglobin

15

just sitting around a campfire with people smoking. [*Id.* at T. 2594-2667]. Dr. Nelson further explained that the carbon monoxide levels inside of the heart "got there because Doty is breathing, and he's breathing in that air that contains carbon monoxide." [*Id.* at T. 2653]. Thus, Dr. Nelson concludes that, at the time he was burned, the victim was still alive because he was breathing in carbon monoxide. [*Id.* at T. 2656-57].

Dr. Nelson testified that the victim had two significant areas of hemorrhaging on the left and back side of the skull, and the brain stem, caused by blunt force trauma, like a punch or kick, which, if left untreated, would be fatal. [*Id.* at T. 2639-44]. There was also additional hemorrhaging to the top of the victim's neck, the shoulder blades, his right forearm, right thigh, and both hands. [*Id.* at T. 2645-2647]. The injuries to the back of the neck, chest area, and near the shoulder blades resulted from blows while the victim was down on the ground. [*Id.* at T. 2647].

Dr. Nelson also took blood samples from various body parts, and urine, eyeball fluid, gallbladder bile, etc., then submitted it all to a laboratory for analysis. [*Id.* at T. 2648]. Testing of the fluids came back negative for use of illegal drugs like cocaine, barbiturates, marijuana, etc., but the blood tests showed a blood alcohol level of 0.434, "over five and a half times the legal limit that the legislature established to operate a motor vehicle. . .and that's .08." [*Id.* at T. 2648-49]. Dr. Nelson explained that for someone who drinks a lot regularly, this amount of blood alcohol would not be fatal, but it could be for someone who does not drink at all. [*Id.* at T. 2649].

Dr. Nelson certified that the cause of death was "multiple injuries," which included the "head injuries," and the "thermal burning." [*Id.* at T. 2667, 2742]. During redirect, Dr. Nelson opined that the eighteen percent carbon monoxide level was from "the gasoline fire," and did not

16

believe it could occur simply if someone were standing long enough in or about a bonfire. [*Id.* at T. 2744]. Further, Dr. Nelson conceded that if the victim were not breathing once the area started burning, that soot would not get in his trachea. [*Id.* at T. 2747].

### B. Defense Case

**Kenneth Edward Felipe, Jr.,** Petitioner's co-defendant testified at trial. [ECF No. 19-27 at T.3098-3148]. Felipe acknowledged that he knew Petitioner for approximately six years and the victim for about a year. [*Id.* at T. 3101-04]. At the time of the incident, Felipe had been living with Petitioner for a few weeks. [*Id.* at T. 3102]. Felipe confirmed there were parties at the home almost every weekend, and that the same group of people were present at these parties. [*Id.* at T. 3102-04]. He also confirmed the victim would attend the parties at his house and other places and would drink heavily and get into fights. [*Id.* at T. 3105].

On Saturday night, the day of the incident, Felipe admits he was drunk, as was Petitioner, and the victim. [*Id. at* T. 3106-08]. He testified the victim tried to instigate a fight with LeClair approximately five or six times. [*Id.* at 3110-3113]. When the victim began annoying girls at the party, Felipe admits he hit the victim so that he could render him unconscious and get him out of the house but denied intending to kill him. [*Id.* at T. 3116-17]. Felipe testified that Petitioner also began hitting the victim when the victim was already on the ground, requiring Felipe to pull Petitioner off the victim. [*Id.* at T. 3117-18]. The videotape was played for the jury, and Felipe explained that he was aware Cody was filming and admitted looking back at the camera a couple of times, smiling before hitting the victim. [*Id.*  at T. 3179-83]. They intended to post the video on Facebook. [*Id.* at T. 3183].

According to Felipe, he and Petitioner picked up the victim and carried him outside to the patio, setting him down on his buttocks and propping him up against the wall. [*Id.* at T.3124-25]. Felipe confirmed that the victim was clearly unconscious at the time but did not think he need medical attention, nor did he believe the victim was seriously injured. [*Id.* at T. 3126].

Later that morning, he and Cody went outside to smoke and checked on the victim a second time, noting he was still on the porch, but Felipe believed still alive. [*Id.* at T. 3129, 3132, 3189]. He, Petitioner, and Cody then moved the victim onto the back of Elliott's truck, which was the subject of the second videotape recovered and played for the jury. [*Id.* at T.3130-32, 3140-41, 3189]. When he and Petitioner first placed the victim inside the truck, Felipe assumed the victim was still alive because he was pliable and flexible. [*Id.* at T. 3193-95, 3200].

Later that morning, he went back to the truck and looked at the victim, who appeared to be asleep, but then when he shook the victim, his body just "rocked" and was "stiff." [*Id.* at T. 3134-35, 3204-05]. As a result, Felipe, shocked, thought the victim was dead. [*Id.* at T. 3135-36, 3205].

Felipe testified that Petitioner and Cody also became upset when learning the victim was dead, and all of them were afraid of going to jail. [*Id.* at T. 3137]. He claims all three came up with the idea of disposing of the body. [*Id.*]. If he had thought the victim was alive, he would have tried to wake him up, and if he felt the victim needed to go to the hospital, he would have taken him there, rather than burn him. [*Id.* at T. 3138, 3143].

**Dr. Ronald Keith Wright** ("Dr. Wright"), a forensic pathologist, testified as a defense expert witness that he reviewed a copy of the police and toxicology reports, one from Wuesthoff and one from Dr. Goldberger, but never received a copy of "the real autopsy report." [ECF No.

18

19-29 at T. 3309-10]. He also testified that he reviewed hundreds of photographs of the autopsy and the scene, a "relatively poor quality videotape . . . of the scene after the deceased was knocked down apparently and dragged," Dr. Nelson's deposition testimony, and "a bunch of stuff" entitled "Rodriguez discovery." [*Id.* at T. 3310-11].

Contrary to the state's expert, Dr. Wright opined that the victim was dead at the time his body was set on fire. [*Id.* at T. 3312]. He based this finding "primarily on the carbon monoxide measurement," because it is "very poisonous" as it attaches to the blood and can cause death. [*Id.* at T. 3312-13]. According to Dr. Wright, an individual "in a gasoline-fueled fire" will not inhale carbon monoxide. [*Id.* at T. 3313-3315]. Dr. Wright opined that the victim died of postural asphyxia, resulting from his head falling forward while he was unconscious and propped up against the outside of Petitioner's house. [*Id.* at T. 3316]. Thus, Dr. Wright testified that if he were certifying the cause of death, he would have found it was due to postural asphyxia from the victim's alcohol consumption. [*Id.* at T. 3317].

Although he was aware that the victim's blood alcohol content was 0.434, he pointed out that Dr. Goldberger's ocular field report on the victim's alcohol level was "a better sample in general than a decomposed blood sample." [*Id.* at T. 3318]. Dr. Wright admitted that the ocular examination reported the victim's alcohol level a half an hour to an hour before his death. [*Id.* at T. 3319]. Dr. Wright explained that even an individual who has created a high tolerance for alcohol can die from a blood alcohol content of .434. [*Id.* at T. 3320]. Dr. Wright insisted that neither blunt force trauma nor burning were the cause of death. [*Id.* at T. 3324-35].

Dr. Wright testified that, although he not impressed by Dr. Goldberger's findings, both Dr.

19

Goldberger's report and the Wuesthoff Report can be relied upon regarding the alcohol findings because "alcohol is really easy to measure." [*Id.* at T. 3326]. Dr. Wright also testified that the eighteen percent finding of carbon monoxide in the victim's blood was "probably correct," but attributed it to "heavy smoking" and being in a "smoke-filled room." [*Id.* at T. 3363]. Dr. Wright further testified that if the victim did, in fact, inhale while he was burning, he would have expected to find gasoline down in the trachea. [*Id.* at T. 3368-69].

Dr. Wright next testified regarding the differences between the spectrophotometry test, which measured carbon monoxide in the blood, and the microdiffusion test. [*Id.* at T. 339199]. He opined that the spectrophotometry test is an "old," "reliable," and "well known" method for measuring "various types of chemicals, and is regularly used in hospitals, but the microdiffusion test is considered "the gold standard to measure carbon monoxide or carboxyhemoglobin." [*Id.* at T. 3391, 3417-18].

Dr. Wright opined that the microdiffusion test was the more reliable test in detecting the level of carbon monoxide in the blood. [*Id.* at 3418]. According to Dr. Wright, if an individual had a degraded sample of blood, it is possible, as in the victim's case, to get a reading on the spectrophotometry test and not on the microdiffusion test. [*Id.* at T. 3393].

Dr. Wright speculated that the serious head injuries described in the reports he reviewed were a result of the brain bleeding while it was being cooked or boiled during the fire. [*Id.* at T. 3413]. On redirect examination, Dr. Wright again confirmed that the spectrophotometry results from the lab were accurate but did not translate into a finding of an eighteen percent carboxyhemoglobin level, considering his review of the microdiffusion test. [*Id.* at T. 3418].

### C. State's Rebuttal Case

**Dr. Goldberger,** a forensic toxicologist and chief of the Division of Forensic Medicine at the University of Florida ("UF"), testified as an expert, in rebuttal, that the UF toxicology laboratory received samples of blood, urine, bile, vitreous humor, and fluids from the eye and stomach contents from the victim. [*Id.* at T. 3426-28]. Regarding the ocular fluid, Dr. Goldberger determined that the alcohol level concentration was .26 grams per deciliter, which equates to three times above the .08 legal blood level limits. [*Id.* at T. 3428-29]. First, Dr. Goldberger explained that during the autopsy, Dr. Nelson was able to obtain sufficient ocular fluid which he forwarded to the UF laboratory for testing. [*Id.* at T. 3429]. Because the fire had not disrupted or punctured the eye, the victim's ocular fluid was still present and could be extracted for testing. [*Id.* at T. 3430].

If, as here, there is a disparity between the blood and ocular alcohol levels, Dr. Goldberger opined he would favor the ocular fluid and not the blood level findings because of the post-mortem disruptions that might have occurred. [*Id.* at T. 3433].

Regarding Wuesthoff Laboratories, Dr. Goldberger testified it is a forensic toxicology laboratory similar to the one he directs at the UF. [*Id.* at T. 3433]. He explained that Wuesthoff Laboratories tests for alcohol, drugs, carbon monoxide, etc., but sometimes will also refer a blood sample to the National Medical Services Labs ("NMS Lab") for testing. [*Id.* at T. 3433-34]. Dr. Goldberger opined that NMS Lab is a reliable and accredited laboratory that tests, for example, for an "adduct," the "hemoglobin, when it gets exposed to carbon monoxide" and "forms carboxyhemoglobin." [*Id.* at T. 3434]. According to Dr. Goldberger, NMS Lab does

21

spectrophotometry testing, used to calculate various forms of hemoglobin, including carboxyhemoglobin. [*Id.* at T. 3435-36].

A carboxyhemoglobin concentration level of eighteen percent, while not fatal, does represent exposure to carbon monoxide. [*Id.* at T. 3441]. Dr. Goldberger opined that the different results between the spectrophotometry and microdiffusion tests can be due to the blood sample being thin, which makes it difficult to confirm a high carboxyhemoglin level. [*Id.* at T. 3444]. Contrary to Dr. Wright, he opined that the spectrophotometry test would be more accurate [*Id.*].

### VII. Discussion

#### A. Direct Appeal Claim *Crawford Confrontation Rights Violation*

In **claim 1,** Petitioner asserts that the trial court violated his Confrontation Rights under *Crawford* when it permitted the medical examiner, Dr. Nelson, to testify regarding the findings in the Wuesthoff Report to establish that the victim was alive when he was burned. [ECF No. 12 at 6; ECF No. 12-1 at 4]. He maintains Dr. Nelson's testimony relied on the findings in the report, prepared by another. [ECF No. 12 at 6; ECF No. 12-1 at 4]. He further contends it was error for the court to permit the expert's testimony without first requiring the expert to lay the proper foundation regarding his knowledge of the report's "methodology, benchmarks, confirmatory test (if any)[,] lack of safeguards, false positive rates, false negative rates, or whether there were any tests whose results flatly contradicted the spectrometry test result." [*Id.*].

Respondent contends, however, that the expert's testimony did not violate Petitioner's confrontation rights as the expert was subject to cross-examination at trial regarding his opinions and findings. [ECF No. 17 at 11-14]. In reply, Petitioner argues that a witness's testimony is

inadmissible unless the witness appears at trial, or if unavailable for trial, the defense has a prior opportunity to cross-examine the witness regarding the substance of his/her testimony. [ECF No. 22 at 1].

The Confrontation Clause violation argument, raised here as **claim 1,** was raised as Ground IV, (a) on direct appeal. *See* [ECF No. 18-1, Ex. 8 at 32-39, 97-105]. Petitioner argued that *Crawford* was violated because evidence regarding the presence of eighteen percent carboxyhemoglobin, as contained in the Wuesthoff Report, was improperly admitted into evidence, overruling the defense's objection. [*Id.*].

### *a. Applicable Law*

Under federal law, the admission of a hearsay statement made by a declarant who does not testify at trial violates a defendant's Confrontation Rights if (1) the statement is testimonial, (2) the declarant is unavailable, and (3) the defendant lacked a prior opportunity for cross-examination of the declarant. *See Crawford*, 541 U.S. at 61. "Only [testimonial statements] cause the declarant to be a 'witness' within the meaning of the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821 (2006) (citing *Crawford*, 541 U.S. at 51).

The Florida Supreme Court in *State v. Belvin*, 986 So. 2d 516 (Fla. 2008), reviewed the admissibility of forensic reports in light of *Crawford*, and concluded that the reports were testimonial, and their admission violated *Crawford* because the right to confront the witness during a discovery deposition was not a sufficient substitute for the right to confront a witness in court. 986 So. 2d at 524-25 (citations omitted).

In *Williams v. Illinois*, 567 U.S. 50 (2012), a plurality of the United States Supreme Court concluded that an expert witness could offer an opinion about a forensic report, however, without ultimately testifying to the underlying truth of that report. 567 U.S. at 57-58. The report, prepared by a non-testifying witness, even though it was not admitted at trial, would not have violated the Confrontation Clause. *See id.* at 59.

Florida courts have also affirmed convictions, finding no confrontation rights violations where testimony was adduced at trial from a witness who interpreted data she did not perform and formulated conclusions that incriminated a defendant, on the basis that, although the test results were testimonial in nature, the witness was present at trial and subject to cross examination with regard to those results. *See Smith v. State*, 28 So. 3d 838, 854 (Fla. 2009). Florida courts have likewise found that "an expert may rely upon hearsay in arriving at an opinion, provided the hearsay is of the type reasonably relied upon by experts in the field." *See Vega v. State Farm Mut. Auto.*, 45 So. 3d 43 (Fla. 5th DCA 2010) (per curiam); *see also* Fla. Stat. § 90.704 (2013). Expert witnesses are afforded more leeway because they are questioned about their opinions and necessarily include all factors that contributed to their opinions. *See Gwathmey v. United States*, 215 F.2d 148, 159 (5th Cir. 1954).

Other cases like the 2009 U.S. Supreme Court of the United States decision in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009), where the Court held that affidavits prepared by forensic technicians are testimonial under *Crawford* are easily distinguishable. There, the Court held that the defendant had the right under the Confrontation Clause to confront the analysts who prepared the affidavits, absent (1) a finding that the analysts were unavailable, and (2) the

24

defendant having had a prior opportunity to cross-examine them. *See id.* at 311; *see also United States v. Sardinas*, 386 F. App'x 927, 942 (11th Cir. 2010) (per curiam) (citing *Melendez-Diaz*, 557 U.S. at 311). The case did not involve an expert testifying regarding its independent opinion of the analyst's work.

Similarly, in *Bullcoming v. New Mexico,* 564 U.S. 647 (2011), a majority of the Court held that a surrogate testifying witness could not be used to admit a forensic report written by a non-testifying technician. 564 U.S. at 663. There*,* the original analyst, who performed a blood-alcohol content test, was unexpectedly placed on unpaid leave on the eve of trial, but the prosecution did not claim that the analyst was unavailable. *See id.* at 661-62. The surrogate witness who testified did not offer an independent opinion, leaving the defense with no opportunity to question the original analyst. *See id.* The Court concluded that testimony from the surrogate witness did not cure the underlying violation of the defendant's confrontation rights under the Sixth Amendment. *See id.* at 663.

More recently, since *Melendez-Diaz*, *Bullcoming*, and *Williams*, the Florida Supreme Court has considered whether a substitute forensic technician, specifically a medical examiner, may testify. *See Calloway v. State*, 210 So. 3d 1160 (Fla. 2017) (per curiam). In *Calloway*, the trial court allowed a doctor to testify instead of the medical examiner, who had performed the autopsies, regarding his independent conclusions on the cause of death and injuries to the victims. 210 So. 3d at 1192. Before and during trial, defense counsel objected on the basis that the prosecution had failed to demonstrate the medical examiner's unavailability, in violation of *Crawford. See id.* Without expressly finding the medical examiner was unavailable, the trial court ruled that the

doctor could offer his own opinion and be subject to cross-examination during trial. *See id.* As a result, the doctor testified that he reviewed photographs and a descriptive narrative taken from the crime scene; body diagrams and sketches; police records; medical records; and medical examiner's autopsy reports to prepare his opinion regarding the causes of death. *See id.* The doctor confirmed that he had developed his own objective findings regarding the cause of death. *See id.*

The Florida Supreme Court concluded that the doctor's testimony did not violate Calloway's Confrontation Clause rights because the doctor was available during trial to testify and was subject to cross-examination. *See id.* at 1195 (citing *Smith*, 28 So. 3d at 853-55, 855 n.12). The medical examiner's autopsy reports were not admitted through the testimony of the doctor. *See id.* (quoting *Williams*, 567 U.S. at 74-76 (plurality opinion) (finding no Confrontation Clause violation in the admission of an expert opinion that relies upon data not directly in evidence); *Bullcoming*, 564 U.S. at 668 (Sotomayor, J., concurring in part)).

### b. Analysis

Similarly, there was no Confrontation Clause violation here. Dr. Nelson was not directly involved in the testing and results of the carboxyhemoglobin levels as reflected in the Wuesthoff Report. However, Dr. Nelson's conclusions regarding whether the victim was alive or dead at the time he was kidnapped and then burned, and relating to the cause of death, did not solely rely upon the results of the blood test for carboxyhemoglobin. To the contrary, Dr. Nelson testified that, in formulating his opinions, he also considered: (1) the weight of the victim's lungs, (2) the cherry-red internal skin color, (3) the fact that nicotine had dissipated from the victim's blood, (4) that gasoline was found in his throat, (5) the hyperemia or inflammation in the victim's airway, and

(6) the victim's body was in a position inconsistent if rigor mortis had set in while the victim was in the truck. These findings, together with observations of other trauma to the victim's body, formed Dr. Nelson's opinions.

Dr. Nelson opined, contrary to defense expert Dr. Wright, that the damage to the victim's head injuries were severe, producing internal bleeding to the brain. [ECF No. 19-23 at T. 2616, 2642-44, 2635]. All the victim's injuries, while serious, were not fatal, and Dr. Nelson concluded that the victim was alive at the time he was burned. [*Id.* at T. 2625-27, 2675]. Dr. Nelson made clear he was not "fixated" on the carboxyhemoglobin level in the spectrophotometry report, but the conclusion that the victim's blood contained eighteen percent carboxyhemoglobin was significant, suggesting the victim was alive when he was burned. [*Id.* at T. 2657, 2702, 2745].

It is well settled that, in rendering his opinion regarding the cause of death, Dr. Nelson was permitted to rely upon the results of the toxicology report, and the other evidence previously mentioned as he was subject to cross examination by the defense. Thus, Petitioner's Confrontation Rights were not violated. Petitioner has not demonstrated that the appellate court's rejection of the claim on direct appeal was contrary to applicable federal constitutional principles. Consequently, Petitioner is not entitled to relief on this claim.

In addition to his argument regarding the fact that Dr. Nelson's testimony referred to the Wuestoff Report, in his Reply, Petitioner argues for the first time that the trial court violated Federal Rule of Evidence 702, and its state equivalent, Fla. Stat. § 90.702, as well as *Daubert v. Merrel Dow Pharms, Inc.*, 509 U.S. 579, 589 (1993), and the hearsay rule when it "supplanted" evidence or the jury's fact finding role rather than merely assured that the evidence is "sufficiently

27

reliable and relevant to the issue." [ECF No. 22].

These arguments, not raised in the state forum, and raised here for the first time in his Reply, are not properly before the Court. Petitioner was required to state all his claims and the factual support for those claims in his sworn amended petition. *See* R. 2(c), Rules Governing Habeas Corpus Cases Under Section 2254 ("The petition must: (1) specify all the grounds for relief available to the petitioner . . ."). He did not do so.

Finally, a reply memorandum may not raise new arguments or evidence, particularly where the evidence was available when the underlying operative petition was filed, and Petitioner was aware (or should have been aware) of the necessity of the evidence. *See Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345, 1349 (S.D. Fla. 2012); *see also TCC Air Servs., Inc. v. Schlesinger*, No. 05–80543–CIV, 2009 WL 565516, at *7 (S.D. Fla. Mar. 5, 2009); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

This Court is mindful of its responsibility to address and resolve all claims raised in a petition. *See Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992); *see also Williams v. Fla. Dep't of Corr.*, 391 F. App'x 806, 810 (11th Cir. 2010) (per curiam). That said, nothing in *Clisby* requires or suggests consideration of a claim raised for the first time in a reply. In fact, the Eleventh Circuit Court of Appeals has repeatedly stated that arguments raised for the first time in a reply are not properly before a reviewing court. *See, e.g., Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338 (11th Cir. 2005); *United States v. Whitesell*, 314 F.3d 1251, 1256 (11th Cir. 2002) (per curiam) (Court need not address issue raised for first time in reply brief); *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999) (issue raised for first time in reply brief was waived).

## A. Ineffective Assistance of Counsel Claims

In **claims 2 through 5,** Petitioner raises multiple arguments challenging counsel's effectiveness. Preliminarily, Petitioner does not identify in any of his ineffective claims which specific counsel was ineffective, raising it simply in general terms. Petitioner, however, was represented by two Assistant Public Defenders ("APD"), APD Robert H. Gray, a seasoned trial attorney, licensed in the State of Florida since October 16, 1984, and APD Tonmiel Rodriguez, licensed in the State of Florida since October 4, 2010. The Court has taken judicial notice of the online lawyer directory of the Florida Bar. *See* Fed. R. Evid. 201.

Petitioner has the burden, however, to demonstrate which, if any, or all, of his attorneys were ineffective. *See generally Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011). "[A] habeas case is not a vehicle for a so-called fishing expedition via discovery, an effort to find evidence to support a claim." *Hittson v. GDCP Warden*, 759 F.3d 1210, 1271 (11th Cir. 2014) (internal citations omitted). Similarly, "district court judges are not required to ferret out delectable facts buried in a massive record, like the one in this case." *Chavez*, 647 F.3d at 1061. He has not done so here. This alone is fatal to his ineffective assistance of counsel claims.

1. Failure to Compel Deposition Testimony Susan Adams

In **claim 2,** Petitioner asserts that his attorney was ineffective for failing to file a motion to compel or to show cause regarding Susan Adams ("Adams"), a toxicologist and laboratory technician he claims was responsible for preparation of the Wuesthoff carboxyhemoglobin test result. [ECF No. 12 at 8; ECF No. 12-1 at 5]. Petitioner asserts counsel should have moved to compel Adams's deposition testimony or appearance at trial. [ECF No. 12-1 at 5].

29

At first, Petitioner alleges that Adams's signature appears on the bottom of the Wuesthoff Report and was the individual "who ultimately conducted the analysis in this matter" at the medical examiner's suggestion. [ECF No. 12-1 at 5-6]. Later, however, he concedes the report contains Adams's name as the individual "who reviewed" the Wuesthoff Report. [*Id.* at 6]. At this juncture, it bears mentioning that page 2 of the Wuesthoff Report reveals "Testing performed by NMS Labs," in White Grove, Pennsylvania. [ECF No. 22 at Ex. B]. The report reflects it was completed on July 20, 2012 by NMS. [*Id.* at 1-2]. More importantly, it further states, "Specimens were intact upon receipt. Chain of custody, specimen security and integrity has been maintained. Testing has been performed *as requested*." [*Id.* at 2]. The Wuesthoff Report does not state that Adams was the "creator of the report," or conducted the testing, as Petitioner suggests, but merely that the report was "reviewed by" her. [*Id.*]. Nonetheless, Petitioner argues Adams's testimony was critical because she would have provided "material testimony" regarding "confirmatory testing by microdiffusion," and the "difference between the spectrophotometry testing and microdiffusion." [*Id.*]. Petitioner also maintains he wanted Dr. Wright's response during direct examination [*See* ECF No. 19-29 at T. 3338-40], regarding contents of the Wuesthoff Report, to be considered by the jury, but the trial court sustained the prosecutor's objection to Dr. Wright's testimony regarding the findings in the report. [*Id.*].

In the Rule 3.580 Motion, Petitioner argued that this information would have established that the victim was dead at the time the body was burned, thereby negating premeditation. [ECF No. 18-2, Ex. 13 at 278]. Respondent argues that Petitioner is not entitled to relief on this claim, having failed to show deficiency or prejudice under *Strickland.* [ECF No. 17 at 14-15]. Respondent

30

explains that Petitioner has not demonstrated that Adams would have testified as suggested, much less that she would have been available to testify at trial if compelled to do so. [*Id.* at 15]. In any event, Petitioner called Dr. Wright as his expert, who explained the differences between the spectrophotometry and microdiffusion tests, how the difference results between each could be had, and its significance. [*Id.* at 16]. In his Reply, Petitioner affirms he stands on the arguments raised in his memorandum. [ECF No. 22 at 8].

### a. Applicable Law Re Failure to Compel Witness's Testimony

Under Florida law, for a claim of ineffective assistance of counsel, based on the failure to investigate, interview or call a witness, to be facially sufficient, the allegations must include: (1) the identity of the prospective witness; (2) that the prospective witness would have been available to testify at trial; (3) the substance of the testimony; and, (4) an explanation as to how the omission of the testimony prejudiced the outcome of the trial. *See Nelson v. State*, 875 So. 2d 579, 583 (Fla. 2004). Failure to demonstrate all four prongs above is fatal to such a claim under Florida law. Under federal law, whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy, which seldom, if ever, will be second-guessed. *See United States v. Costa*, 691 F.2d 1358, 1364 (11th Cir. 1982) (per curiam); *see also Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).

To show that counsel's conduct was unreasonable, defendant must demonstrate that no competent counsel would have taken the action that his counsel did take. *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). The prejudice prong in failing to call a witness is a heavy one because it requires "allegations of what a witness would have testified to" which are

31

often "largely speculative." *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980) (*per curiam*)). Speculation about what witnesses could have said is not enough to establish the prejudice-prong of *Strickland. See Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004). Of course, a petitioner cannot maintain an ineffective assistance of counsel claim "simply by pointing to additional evidence that could have been presented." *Van Poyck v. Fla. Dep't of Corr.*, 290 F.3d 1318, 1324 (11th Cir. 2002) (per curiam).

### b. Analysis

Even if counsel had, as suggested, compelled the deposition of Adams, and assuming further that Adams would have testified as suggested by Petitioner, there is nothing of record to demonstrate how this would have affected the guilt phase portion of Petitioner's trial. Thus, Petitioner cannot demonstrate *Strickland* prejudice. *See Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1262 (11th Cir. 2014); *see also Nelson*, 875 So. 2d at 583. Petitioner has not provided a sworn statement either in the state forum or this case confirming that Adams would have been available to testify and would have testified as claimed. Petitioner's allegations do not rise above a speculative level.

Further, the record reveals that counsel made several attempts, though unsuccessful, to secure the testimony of Adams by deposition and at trial. *See* [ECF No. 19-23 at T. 2577-78]. Because his efforts were unsuccessful, he pursued other strategies to limit the introduction of other testimony regarding the Wuesthoff Report and references to its findings by Dr. Nelson, the medical examiner. [*Id.*].

32

In any event, Dr. Wright, the defense's expert provided testimony challenging the Wuesthoff Report and the differences between that report and the spectrophotometry report. When the claim was raised as Ground I in the Rule 3.850 proceeding, it was summarily rejected by the trial court on the finding Petitioner had not demonstrated deficiency or prejudice under *Strickland*. [ECF No. 18-14 at Ex. 14 at 1-4]. Specifically, the trial court found as follows:

> First, the defense represented they had doubts that Susan Adams performed the test and authored the report, and argued against its introduction. The record reflects Defendant's counsel motioned to preclude Dr. Nelson, the medical examiner, from testifying regarding the reports from Wuesthoff Laboratory concerning the carboxyhemoglobin results. . . . The court was informed that Susan Adams had failed to appear for a deposition, despite subpoena, and that there currently was a subpoena for her to appear for trial, but it was uncertain if she had been served. Counsel stated that although the report appeared to have been authored by Susan Adams at Wuesthoff, but apparently the testing was not actually done locally at Wuesthoff but was shipped out-of-state. It was also represented by Defendant's attorney that although there had been a good-faith effort to secure Ms. Adams, it was his understanding that Ms. Adams was not actually the person who performed the analysis and authored the report. Co-defendant's counsel added that they were not sure who conducted the testing, what laboratory it was forwarded to, or what their protocols were. Co-defendant's counsel argued that it was a very real potential defense theory that the carboxyhemoglobin level in the report was wrong and the testing was incorrect. Despite arguments from the defense, the court denied the motion to exclude Dr. Nelson's testimony and denied the accompanying motion for mistrial. Even after Dr. Nelson's testimony regarding his opinions based on the Wuesthoff report, the record reflects Defendant's counsel made (or joined in) various motions and objections attacking Dr. Nelson's testimony and the Wuesthoff results; those motions were repeatedly denied. . . .
>
> Second, there was defense-presented trial testimony as to the differences between spectrophotometry and microdiffusion, and what was meant by 'confirmatory testing by microdiffusion was negative.' Defense expert Dr. Ronald Wright is a board-certified forensic pathologist who has experience in toxicology and spectrophotometry testing, reviewed the autopsy report, police report, toxicology reports (including the report from Wuesthoff), a video recording of the scene, approximately 104 photographs, and multiple depositions. . . . Dr. Wright explained what a spectrophotometry was and explained in toxicology testing you

first do a 'cheap' and 'easy' presumptive test (the spectrophotometry test), then you conduct a 'more specific' and a 'better' confirmatory test (the microdiffusion test). . . . He testified that the preliminary test was positive, the confirmatory test was negative, "so the bottom line is it was negative." . . . When asked whether one test was more reliable than the other, Dr. Wright testified that the microdiffusion test 'is the gold standard of analysis.' . . . Additionally, an expert for the State, Dr. Bruce Goldberger, a forensic toxicologist who examined a sample of the victim's blood, also testified as to the difference between spectrophotometry and microdiffusion. . . . However, he testified that the microdiffusion test would have issues when detecting the level of carbon monoxide due to the thin and water nature of the blood sample, but that the spectrophotometry test would not have that problem. . . .

Third, there was testimony that because the microdiffusion test was negative, the medical examiner's conclusion that the victim was alive when he was burned was not correct. Dr. Wright testified that Dr. Nelson's reliance on the 18 percent carboxyhemoglobin as the basis to determine the victim was alive when lit on fire was not valid, reiterating that the spectrophotometry testing was just a scanning technique. . . . Furthermore, Dr. Wright testified that the victim was already deceased when his body was burned and opined the victim's death was caused by postural asphyxia due to alcohol intoxication. . . .

Fourth, while Dr. Nelson testified that the victim was alive when burned due to the carboxyhemoglobin level listed in the Wuesthoff report . . . it appears the report was only one factor in his conclusion. Dr. Nelson also attached significance to the red coloration of the victim's trachea and interior of the body. . . the weight of the victim's lungs . . . and the apparent dissipation of nicotine over a period of time before the victim died. . . .

Fifth, although Defendant's claim to prejudice appears focused on the State's ability to prove premeditation, he was charged with the first degree murder under two theories: premeditation or felony murder based on kidnapping. As the jury found Defendant was guilty of kidnapping, they may have found him guilty of first degree murder based on that kidnapping. *See* Fla. Stat. § 782.04(1)(a)(2.) *and attached verdict form.*

Given all of the foregoing, the court finds counsel was not ineffective for failing to file a motion to compel the deposition (or trial testimony) of Susan Adams. The court also finds Defendant was not prejudiced. Ground one is **denied.**

[ECF No. 18-2, Ex. 14 at 1-4], (emphasis in original). The trial court's denial of the claim was

34

subsequently *per curiam* affirmed on appeal in a decision without written opinion. *See Rodriguez v. State*, 275 So. 3d 603 (Fla. 2d DCA 2019), [ECF No. 18-3, Ex.18 at 245].

The trial court's rejection of the claim, which was affirmed on appeal, was not unreasonable. Adams's testimony may well have been cumulative in light of Petitioner's expert's testimony. Counsel is not ineffective for failing to present cumulative evidence. *See Darling v. Sec'y, Dep't of Corr.*, 619 F.3d 1279, 1284 (11th Cir. 2010); *see also Van Poyck*, 290 F.3d at 1324 n.7 (no ineffective assistance arising from failure to present merely cumulative evidence). Petitioner has not demonstrated deficiency or prejudice under *Strickland* "simply by pointing to additional evidence that could have been presented." *Van Poyck*, 290 F.3d at 1324.

Third, as noted by the trial court in its rejection of the claim, the issue of the Wuesthoff Report was fully explored at trial during direct and cross-examination of the state and defense witnesses. Moreover, the prosecutor and the defense agreed that Adams had not performed the testing, and that Wuesthoff had outsourced the testing to a laboratory in Philadelphia. [ECF No. 19-23 at T. 2578-79]. In fact, defense counsel admitted it was possible that Adams purported testimony was "irrelevant" because she was "not the person who performed the analysis and authored the report." [*Id.* at T. 2580]. Counsel further conceded that even if Adams had appeared and testified at trial as suggested, "she wouldn't know the answers" to the questions because "she didn't do the test." [*Id.* at T. 2688-89].

Under these circumstances, the court's finding that Petitioner cannot establish either deficiency or prejudice under *Strickland* is more than amply supported by the record so that relief is not warranted. The rejection of the claim in the state forum was not contrary to nor an

unreasonable application of *Strickland* to the facts and should stand.

2. Failure to Investigate Wuesthoff Laboratories

In **claim 3,** Petitioner asserts that his attorney was ineffective for failing to investigate Wuesthoff Laboratories regarding its testing procedures and the findings contained in its report regarding the carboxyhemoglobin level. [ECF No. 12 at 9; ECF No. 12-1 at 5]. In his Rule 3.850 Motion, Petitioner conceded that counsel conducted "depositions, reviewed the lab notes of Susan Adams (more information than the State had at the time), and mentioned having obtained 'bench/lab notes.'" [ECF No. 18-2, Ex. 13 at 11].

Respondent argues that Petitioner cannot demonstrate deficiency or prejudice under *Strickland* because he has not alleged how further investigation of the report and then its introduction at trial would have altered the outcome of the trial, resulting in Petitioner's acquittal. [ECF No. 17 at 18-20]. Respondent suggests that the introduction of the report would have contradicted his prior two claims, strengthening Dr. Nelson's conclusion that the victim was alive when he was doused with gasoline and set on fire. [*Id.* at 19-20].

In his Reply, Petitioner argues that further investigation would have established that "NMS Labs was the actual lab that did [the] testing," which in turn would have revealed the identity of the actual toxicologist who performed the tests referenced in the report. [ECF No. 22 at 4]. Petitioner maintains this would have cast doubt on the state's evidence regarding the first-degree murder and kidnapping offense. [*Id.* at 5]. Petitioner suggests counsel should have been better prepared to challenge the contents of the report, not the opinions of the experts on the findings of the report. [*Id.* at 5]. He maintains that had this information been disclosed, counsel could have

36

discredited the findings contained in the Wuesthoff Report by calling a qualified, competent

toxicologist to demonstrate that the victim was not alive at the time of the purported kidnapping

and when the body was set on fire. [*Id.* at 5-6].

The identical claim, raised as Ground II of the Rule 3.850 Motion, was denied by the trial

court on the following findings:

> . . . He contends counsel could have better defend[ed] Defendant with this information, and would have had the opportunity to present additional expert witness testimony that the victim was dead at the time of the burning . . .
>
> However, the record reflects the defense did investigate Wuesthoff Laboratories and the testing it performed. As more thoroughly analyzed in ground one, above, the purported author of the report was subpoenaed for deposition and trial. The defense also presented expert testimony from Dr. Ronald Wright, a board-certified forensic pathologist with experience in toxicology and spectrophotometry testing who had reviewed the Wuesthoff Report. . . . Dr. Wright testified in detail regarding spectrophotometry, microdiffusion and the relationship between the two tests. . . . He also gave his opinion on why the spectrophotometry test indicated an 18 percent carboxyhemoglobin level, testifying that the test is a colorimetric technique that measures how red the blood is, and that color can be influenced by conditions such as decomposition or the presence of nitrites or nitrosamine compounds. . . . In specific disagreement with Dr. Nelson's opinion as to the victim's cause of death, Dr. Wright testified that he would have found the victim's death was accidental and opined that the victim was not alive when his body was burned. . . .
>
> Additionally, the defense repeatedly objected to Dr. Nelson testifying regarding the carboxyhemoglobin levels in the Wuesthoff Report. *See analysis in ground one, above.* The defense also questioned the veracity of the results in front of the jury--delving repeatedly into the experts' lack of knowledge of the lab's testing conditions and protocols, test reliability, possibility of contamination, calibration of equipment, error rates, lack of test certification, lack of corrective action taken on inconsistent test results, and so further. *See attached trial transcript, pages 2675-2679, 2721-2727, 2737, 2741-2742, 3347-3349, 3348, 3451-56, and 3461-3466.*
>
> Given the foregoing, the court finds counsel not ineffective. The court also

37

finds Defendant was not prejudiced; confidence in the outcome is not undermined.
Ground two is **denied.**

[ECF No. 18-2, Ex. 14 at 4-5]. The trial court's denial of the claim was subsequently *per curiam*

affirmed on appeal in a decision without written opinion. *See Rodriguez,* 275 So. 3d 603, [ECF

No. 18-3, Ex.18 at 245].

Independent review of the state trial record corroborates the trial court's findings that

Petitioner's attorneys vigorously cross-examined and presented evidence, including testimony

from expert Dr. Wright challenging the Wuesthoff Report findings and Dr. Nelson's opinions

based on the Report. Further, the record also confirms that the defense attempted to ascertain the

identity of the individual who conducted the testing in order to question the protocols and methods

used to attain the findings contained in the report. Even if counsel had done as suggested,

conducting additional investigation and securing additional witnesses, Petitioner has not

demonstrated that the outcome of his trial would have been different. Thus, he cannot demonstrate

prejudice under *Strickland*. The rejection of the claim was, therefore, in accordance with

controlling federal constitutional principles, and should not be disturbed here.

3. Failure to Object to State's Rebuttal Expert Witness

In **claim 4,** Petitioner asserts that his attorney was ineffective for failing to object to the

testimony of the state's rebuttal expert witness, Dr. Goldberger. [ECF No. 12 at 11; ECF No. 12-

1 at 7]. Petitioner maintains the testimony was cumulative to evidence introduced during the state's

case-in-chief regarding the results of the microdiffusion versus spectrophotometry tests and the

findings of the medical examiner. [ECF No. 12-1 at 7]. Petitioner maintains that Dr. Goldberger's

testimony was "inadmissible hearsay," which simply "inflamed the minds of the jury." [*Id.*].

Respondent argues Petitioner is not entitled to relief, having failed to establish deficiency or prejudice under *Strickland*. [ECF No. 17-21-23]. According to Respondent, counsel had no "basis" for raising a meritless objection to the rebuttal witness. [*Id.* at 22].

In his Reply, Petitioner argues that Dr. Goldberger's testimony was "unreliable" because his "only involvement" was testing of the victim's ocular fluid to determine the victim's alcohol level. [ECF No. 22 at 6]. Petitioner also argues that Dr. Goldberger's report fails to mention anything about the reliability of the victim's "thin, watery" blood sample, and his testimony as to this finding advanced "new arguments and new evidence" never presented by the defense expert or the medical examiner. [*Id.* at 6-7].

The decision to permit rebuttal testimony resides in the sound discretion of the trial judge. *See Geders v. United States*, 425 U.S. 80, 86 (1976); *see also Tundidor v. State*, 221 So. 3d 587 (Fla. 2017) (per curiam) (citing *Williams v. State*, 967 So. 2d 735, 747-48 (Fla. 2007) (per curiam)). Thus, the trial court may not only control "the scope of rebuttal testimony," and "the scope of examination of witnesses," but also "may refuse to allow cumulative, repetitive, or irrelevant testimony." *Geders*, 425 U.S. at 86-87 (citations omitted).

39

Petitioner's identical claim, raised in Grounds V and VI of the Rule 3.850 Motion, was denied by the trial court, relying on the well settled Florida principle that rebuttal evidence may be admitted in rebuttal even if it is cumulative, citing *Britton v. State*, 414 So. 2d 638, 639 (Fla. 5th DCA 1982). [ECF No. 18-3, Ex. 14 at 7]. Further, the trial court rejected the claims on the following findings:

> In this case, the defense expert, Dr. Wright, testified in detail regarding spectrophotometry and microdiffusion testing methods and their relationship. . . .He also repeatedly relied on the victim's higher blood alcohol content level (rather than the lower ocular fluid alcohol level) to explain that the victim's alcohol level was lethal. . . . For rebuttal, the State called Dr. Goldberger--the forensic toxicologist who tested samples from the victim for alcohol analysis. . . .He testified regarding the disparity between the alcohol level in the blood and ocular fluid samples, stating the ocular fluid alcohol content was more reliable in this particular case due to fire. . . . He also testified regarding the spectrophotometry and microdiffusion testing methods and their relationship to one another. . . . The court notes that the details of these testing methods were something the medical examiner (in the State's case-in-chief) did not testify to as he was "no conversant with the methodology[,]" suggesting it would be best to ask a toxicologist regarding the methodology involved in performing the tests. . . .

> The testimony of Dr. Goldberger was rebuttal evidence as it explained or contradicted material evidence offered by Defendant through the testimony of Dr. Wright. Accordingly, Dr. Goldberger's testimony would have been admissible in the State's case-in-chief. Accordingly it would have been meritless for counsel to have objected to the State calling Dr. Goldberger for rebuttal; counsel was not ineffective for failing to make a meritless objection. Furthermore, Defendant has failed to show he was prejudiced by counsel['s] actions or inactions in this matter. Ground five is **denied.**

*     *     *

> In ground six, Defendant asserts that trial counsel was ineffective for failing to object to the illegal vouching of the lab and lab results [by Dr. Goldberger.] . . .

> The record indicates Dr. Goldberger testified that he was familiar with National Medical Services Labs ("NMS"), had visited their labs on numerous

occasions, knows all of their toxicologists, refers some work to NMS, and believes NMS is a reliable lab. . . .In context, Dr. Goldberger was providing his personal opinion on NMS, stating that he 'wouldn't send work to them if' he did not believe they were reliable. This is not objectionable vouching, and counsel was not ineffective for failing to raise an objection. The record does indicate that co-defendant's counsel did question Dr. Goldberger's knowledge regarding NMA--eliciting testimony that he did not work at NMS, was not familiar [with] another lab's error rates or testing protocols, and agreed that there could be false positives and false negatives in testing. . . .

The court finds that counsel was not ineffective. Further, in light of all the evidence at trial, the court finds Defendant was not prejudiced. Ground six is **denied.**

[ECF No. 18-2, Ex. 14 at 4-5]. The trial court's denial of the claim was subsequently *per curiam* affirmed on appeal in a decision without written opinion. *See Rodriguez*, 275 So. 3d at 603, [ECF No. 18-3, Ex.18 at 245].

Independent review of the record confirms that the trial court's rejection of the claim was proper. Dr. Goldberger's testimony was permissible as Petitioner had provided expert testimony that the cause of death was due to alcohol intoxication, and that the findings of Dr. Nelson were improbable, casting doubt on the veracity of the Wuesthoff Report and findings and opinions of Dr. Nelson, the medical examiner. *See* [ECF No. 19-29 at T. 3317-18, 3312, 3325, 3348].

In rebuttal, the state offered the expert testimony of Dr. Goldberger, a forensic toxicologist, on the issue of the differences between the spectrophotometry and microdiffusion testing and reliability of each. [ECF No. 19-29 at T. 3425-26]. Dr. Goldberger also testified regarding his finding that the ocular fluid in the victim's eyes confirmed he was alive at the time he was burned. [*Id.* at T. 3428]. The defense was able to cross-examine Dr. Goldberger regarding the basis for his

conclusions, including his motive for testifying as a state witness, which included pecuniary gain. The jury was instructed on weighing the credibility of the witnesses.

Since the introduction of the rebuttal testimony was proper under Florida and federal law, Petitioner has not shown deficiency or prejudice under *Strickland*. Thus, the rejection of the claim in the Rule 3.850 proceeding was a reasonable application of federal constitutional principles and should not be disturbed here.

4. Prosecutorial Misconduct During Closing Argument

In **claim 5,** Petitioner asserts that his attorney was ineffective for failing to object to various instances of prosecutorial misconduct during closing argument. [ECF No. 12 at 17; ECF No. 12-1 at 8]. Specifically, he claims counsel should have objected to the prosecution comments (1) ridiculing defense witnesses; (2) illegally vouching for state witnesses; and (3) improperly arguing that the burden of proof beyond a reasonable doubt could be overcome based on a credibility determination of the witnesses. [ECF No. 12-1 at 8-9]. Respondent argues the rejection of this claim in the Rule 3.850 proceeding is entitled to deference because Petitioner has not demonstrated deficiency or prejudice under *Strickland*. [ECF No. 17 at 23-25]. In Reply, Petitioner stands on the argument raised in his supporting memorandum [ECF No. 12-1]. *See* [ECF No. 22]. As discussed below, none of the prosecutorial misconduct claims warrant relief.

### a. Applicable Law Re Prosecutorial Misconduct

The Supreme Court made clear in *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), that "improper comments by a prosecutor require a new trial only if they 'so infected the [original] trial with unfairness as to make the resulting conviction a denial of due process." To demonstrate that

42

the prosecutor's prejudicial comments affected a petitioner's substantial rights requires there be a reasonable probability that, but for the remarks, the outcome of the trial would have been different. *See United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

Further, the purpose of closing argument is to explain to the jury what it must decide and what evidence is relevant to its decision. *See United States v. Iglesias*, 915 F.2d 1524, 1529 (11th Cir. 1990). The jury's decision is to be based upon the evidence presented at trial and the legal instructions given by the court. *See Chandler v. Florida*, 449 U.S. 560, 574 (1981) ("Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law."); *see also Ward v. State*, 765 So. 2d 299, 301 (Fla. 5th DCA 2000) ("most of the prosecutor's comments were 'fair comment' on the defense counsel's closing argument"); *Laboo v. State*, 715 So. 2d 1034, 1035 (Fla. 1st DCA 1998) (per curiam) (prosecutor's comments to be viewed in context of all the evidence presented and the initial arguments of defense counsel).

### b. Instances of Alleged Misconduct

#### (i). Witness Ridicule

According to Petitioner, the prosecution ridiculed Dr. Wright's testimony by stating during closing argument that, because Dr. Wright was or had been a "doctor," a "lawyer," a "pilot," a "licensed pesticide applicator," and "police officer" [ECF No. 19-30 at T. 3514], his testimony was far from reliable. [ECF No. 12-1 at 8]. Respondent argues that Petitioner is not entitled to relief because the prosecution was simply noting Dr. Wright's work history which was neither ridiculous nor denigrating. [ECF No. 17 at 24].

43

When raised as Ground VII in his Rule 3.850 Motion, the trial court denied relief on the basis that "the State was repeating facts elicited through testimony--including Dr. Wright's hourly rate and business card slogan and that Dr. Wright was a doctor, lawyer, pilot, police officer, and pesticide applicator." [ECF No. 18-2, Ex. 14 at 9]. The court found specifically that, "restating trial testimony" and the statement "'bless his heart'" "does not amount to prosecutorial misconduct," so that counsel was "not ineffective for failing to raise [this] objection, and Defendant has failed to show prejudice." [*Id.*]. That denial was *per curiam* affirmed on appeal in a decision without written opinion. *See Rodriguez*, 275 So. 3d at 603, [ECF No. 18-3, Ex. 17].

In view of the entire record, the prosecutor's comments did not render Petitioner's trial fundamentally unfair. *See United States v. Hall*, 47 F.3d 1091, 1098 (11th Cir. 1995) ("Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record.") (citations omitted).

### (ii). Improper Vouching

Petitioner also alleges that the prosecution improperly vouched for the credibility of its own witness by suggesting that Dr. Goldberger was more credible than the defense's expert, Dr. Wright. [ECF No. 12-1 at 8-9]. Respondent argues that Petitioner is not entitled to relief, having failed to demonstrate that improper vouching occurred. [ECF No. 17 at 24].

It is true that "attempts to bolster a witness by vouching for his credibility are normally improper and constitute error." *United States v. Newton*, 44 F.3d 913, 921 (11th Cir. 1994) (citations omitted). Courts have found it improper for the "prosecution to place the prestige of the Government behind a witness by making explicit personal assurances of the witness' veracity." *Id.*

44

(citations omitted). The Eleventh Circuit has stated that "[w]e denounce lawyers who give their personal opinion that 'I believe the witness is telling the truth.'" *Id.* (citing *United States v. Young*, 470 U.S. 1, 8 (1985)). Nevertheless, it should be noted that "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility. . .it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991).

Again, when raised in the Rule 3.850 Motion, the trial court denied relief, finding that the statements identified by Petitioner "do not qualify as objectionable vouching as the prosecutor was restating testimony from the various expert witnesses." [CV ECF No. 18-2, Ex. 14 at 10]. Thus, the court concluded that counsel was not ineffective for failing to make a meritless objection, nor was Petitioner prejudiced as a result. [*Id.*].

In this case, the prosecutor did not personally vouch for the testimony of its witnesses. Rather, when read in context, it was permissible for the state to argue that there were no contradictions or inconsistencies in the testimony of its witnesses. The prosecutor was not prohibited from arguing that its witnesses were, in fact, credible. *See United States v. Caporale*, 806 F.2d 1487, 1513 (11th Cir. 1986).

In any event, immediately before closing argument, the trial court clearly and correctly instructed the jury that what the lawyers said was not evidence in the case, should not be considered as such, and that the case must be decided only upon the evidence presented at trial. [ECF No. 19-30 at T. 2494, 3501, 3595-3633]. It is generally presumed that jurors follow the court's instructions. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

45

Here, the prosecution's argument merely restated and compared the testimony of the various expert witnesses. *See* [ECF No. 19-30 at T. 3580-85]. This is not improper vouching under federal constitutional principles. Consequently, the rejection of the claim in the Rule 3.850 motion finding Petitioner had not satisfied *Strickland,* which was affirmed on appeal, was not an unreasonable application of the law to the facts. Relief is not warranted on this claim and should not be disturbed here.

(iii). Improper Argument Regarding Burden of Proof

Petitioner claims the state attempted to lessen its burden of proof by claiming that guilt could be established by a credibility determination rather than by proof beyond a reasonable doubt. [ECF No. 12-1 at 9]. Respondent argues that Petitioner is not entitled to relief because counsel was not ineffective for failing to raise a meritless objection. [ECF No. 17 at 25]. Respondents rely upon *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao E Exportacao LTDA*, Nos. 08-cv-20738-KMM and 07-cv-21827-KMM, 2013 WL 12061479 (S.D. Fla. Mar. 21, 2013) (finding that the jury, as the factfinder, is entitled and obligated to consider the qualifications and credibility of an expert witness, and weigh conflicting testimony when arriving at a verdict.). [ECF No. 17 at 24-25]. Thus, Respondent concludes the rejection of the claim by the state court is entitled to deference. [*Id.*].

The Rule 3.850 court denied this precise claim, finding that "when the jury is presented with competing theories from multiple experts, they must determine which testimony (or pieces of testimony) they choose to believe. In context, the prosecutor compared the experts' differing testimony regarding testing results and did not mislead the jury as to the burden of proof as

46

Defendant claims. *See attached trial transcript, pages 3581-3585.* Counsel was not ineffective for failing to object, nor was Defendant prejudiced. [ECF No. 18-2, Ex. 14 at 10]. The trial court further found that "when evaluating ground seven as a whole," "counsel was not ineffective," and "given all of the evidence at trial, the court finds the Defendant was not prejudiced." [*Id.*]. Further, the court noted that the jury had been instructed that what the attorneys said during closing argument was not evidence. [*Id.* citing ECF 19-30 at T. 34994, 3501]. The denial of this claim was affirmed on direct appeal in a decision without written opinion. *See Rodriguez*, 275 So. 3d at 603, [ECF No. 18-3, Ex. 17].

When viewing the prosecutor's arguments in relation to the evidence adduced at trial it is evident that the comments were not improper, nor did they render Petitioner's trial fundamentally unfair. There is plainly nothing in the record to suggest that the prosecutor made these statements in a deliberate attempt to distract the jury or mislead the jurors as to issues of guilt or innocence. *See Hall*, 47 F. 3d at 1098 ("Claims of prosecutorial misconduct are fact specific inquiries which must be conducted against the backdrop of the entire record.") (citations omitted).

### c. Conclusion

In light of the strength of the evidence against Petitioner at trial, there is nothing in the record to suggest that the prosecutor's comments, even when taken together, affected the jury's verdict. Thus, Petitioner has not demonstrated either deficiency or prejudice under *Strickland* arising from counsel's failure to lodge an objection or move for a mistrial based on the prosecutor's closing argument. As such, the rejection of the claim in the Rule 3.850 proceeding was proper and should not be disturbed here.

### VIII. Cautionary Instruction Re *Clisby* Rule

The Court is mindful of the *Clisby* rule that requires district courts to address and resolve all claims raised in habeas corpus proceedings, regardless of whether relief is granted or denied. *See Clisby v. Jones*, 960 F.2d 925, 936-37 (11th Cir. 1992). *Clisby* does not require consideration of claims or arguments raised for the first time in objections. If Petitioner attempts to raise arguments or further factual support for his claim in objections, the court should exercise its broad discretion and refuse to consider the arguments not raised before the magistrate judge in the first instance. *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) (finding no abuse of discretion by the district court in declining to consider timeliness argument that was not presented to the magistrate judge)).

Finally, this court has considered all of Petitioner's arguments in support of his claims for relief. *See Dupree v. Warden*, 715 F.3d 1295, 1299 (11th Cir. 2013) (finding that courts shall review petitioner's claims so long as the claims are presented in a clear and simple language so that the court may not misunderstand it). Petitioner has failed to demonstrate how the state courts' denial of the claims, to the extent they were considered on the merits in the state forum, were contrary to, or the product of an unreasonable application of, clearly established federal law. To the extent a claim was not considered in the state forum, under *de novo* review, the claims do not warrant relief. Whether a precise argument was not specifically addressed here or in the state forum, all arguments were considered and found to be meritless, even if not discussed in detail.

### IX. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on Petitioner to establish the need for a federal

48

evidentiary hearing. *See Chavez*, 647 F.3d at 1060. In reviewing a petition in which a petitioner failed to develop the factual basis for a claim in the state court proceedings, the district court "shall not hold an evidentiary hearing on the claim unless the applicant shows that --(A) the claim relies on--. . .(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offenses." 28 U.S.C. § 2254(e)(2). "[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). The United States Supreme Court has also made clear that § 2254(e)(2) "continues to have force" and restricts federal courts from considering evidence that was not before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (citing *Williams*, 529 U.S. at 427-29).

Because a review of Petitioner's claims shows that he is not entitled to habeas relief, Petitioner is not entitled to an evidentiary hearing.

### X. Certificate of Appealability

A prisoner seeking to appeal a district courts final order denying his petition for writ of habeas corpus has no absolute entitlement to appeal but must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell*, 556 U.S. 180, 183 (2009) (citing *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000); *Wilkinson v. Dotson*, 544 U.S. 74, 78-83 (2005)).

This Court should issue a certificate of appealability only if Petitioner makes "a substantial

showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, a petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id*.

For the reasons addressed in this Report, no certificate of appealability should issue. If Petitioner does not agree, he may bring this argument to the attention of the Chief District Judge in objections.

## XI. Recommendations

Based upon the foregoing, it is recommended that:

1.  the Amended Petition [ECF No. 12] be DENIED;

2.  final judgment be entered in favor of Respondent;

3.  a certificate of appealability be DENIED; and,

4.  the case CLOSED.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro*

*Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).


SIGNED this 31st day of August, 2021.


LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc:     Jonathan Ray Rodriguez, *Pro Se*
        DC#H35582
        Century Correctional Institution
        Inmate Mail/Parcels
        400 Tedder Road
        Century, FL 32535

        Ryan James Sydejko, Asst Atty. Gen'l
        Office of the Attorney General
        Criminal Appeals
        3507 E. Frontage Rd, Suite 200
        Concourse Center 4
        Tampa, FL 33607
        Email: ryan.sydejko@myfloridalegal.com

51